IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BANK OF COMMERCE
 *Plaintiff*,

   v.          Civil Action No. ELH-14-610

MARYLAND FINANCIAL BANK
 *Defendant*.

## MEMORANDUM OPINION

This case arises from a dispute concerning the interpretation of a loan participation agreement dated August 17, 2008 ("Participation Agreement" or "Agreement").[1]  Bank of Commerce ("Commerce"), plaintiff, is the successor in interest to the original lender, Bank of the Eastern Shore ("BOES").  Maryland Financial Bank ("MFB"), defendant, is a loan participant with a 25% "Participation Interest."  Commerce filed a "Complaint For Declaratory Judgment" against MFB, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 with respect to the parties' rights under the Agreement.  *See* ECF 1, "Complaint."[2]  In response, MFB filed an answer and a two-count counterclaim, similarly seeking a declaratory judgment (Count I), and also alleging breach of contract (Count II).  ECF 5 at 4-10.

---

[1] A participation agreement is a financing device, typically involving independent, bilateral relationships: the first between the lead bank and the borrower and the second between the lead bank and the loan participant or participants.  A participant bank purchases a share of a loan issued to a borrower by a lead bank.  *See In re Sackman Mortg. Corp.*, 158 B.R. 926, 931-32 (Bankr. S.D.N.Y. 1993).  Although the participant bank is not a party to the loan agreement, it generally receives, among other things, a corresponding share of the loan's principal and interest payments.  *Id.* at 932.

[2] Subject matter jurisdiction is based on diversity.  *See* ECF 1 ¶ 3; 28 U.S.C. § 1332.  In particular, Commerce is a Texas banking corporation with its principal place of business in Amarillo, Texas, ECF 1 ¶ 1, and MFB is a Maryland chartered trust company with its principal place of business in Towson, Maryland.  *Id.* ¶ 2.

The parties have filed cross motions for summary judgment. Commerce's "Motion for Summary Judgment," ECF 9, is supported by a "Memorandum of Law" (ECF 9-1, collectively with ECF 9, the "Commerce Motion") and exhibits. MFB's "Cross Motion for Summary Judgment and Response in Opposition to Bank of Commerce's Motion for Summary Judgment" is at ECF 11, supported by a "Memorandum of Law" (ECF 11-1, collectively with ECF 11, the "MFB Motion") and exhibits. The central dispute requires the Court to determine whether MFB is entitled to recover 25% of the outstanding balance on the loan initially made by BOES, amounting to $575,691.28, as MFB claims, or, instead, 25% of the foreclosure sale proceeds, amounting to $348,367.46, as Commerce contends.

The issues have been fully briefed,[3] and no hearing is necessary to resolve them. *See* Local Rule 105.6. For the reasons that follow, I will grant the Commerce Motion and deny the MFB Motion.

## I.      FACTUAL BACKGROUND

### A. *The Loan*

On November 17, 2006, Bank of the Eastern Shore, located in Cambridge, Maryland, loaned $3,000,000 (the "Loan") to BSJ Partners, LLC ("BSJ"), a Maryland limited liability company, ECF 9-1 at 2, pursuant to the terms of a Building and Loan Agreement. *See* Limited Forbearance Agreement of May 4, 2011 at 1 ("Forbearance Agreement"), ECF 9-3 at 2. The Loan was for the purpose of acquiring and renovating "the Country Club property," *i.e.*, "133.78

---

[3] Commerce filed a "Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Opposition to Defendant's Cross Motion for Summary Judgment and Request for Hearing." ECF 12. And, MFB filed a "Reply to Bank of Commerce's Response to the Cross Motion for Summary Judgment." ECF 14.

acres of water front property," including a clubhouse, golf course and swimming pool, located in Cambridge (the "Property").[4]  Agreement at 2, ECF 9-2 at 3.[5]

In connection with the Loan, BSJ tendered a promissory note to BOES dated November 17, 2006 ("Note").  Agreement at 2, ECF 9-2 at 3.  The Note was secured by a Purchase Money Deed of Trust and Security Agreement, recorded in the land records of Dorchester County at Liber 772, Folio 487.  Forbearance Agreement at 1, ECF 9-3 at 2.  The Property served as collateral for the Loan under the Deed of Trust, and "had an 'as-completed' appraised value of $4,000,000" as of November 1, 2006.  Agreement at 2, ECF 9-2 at 3.[6]

Nearly two years later, on August 17, 2008, BOES and MFB entered into the Participation Agreement, by which MFB purchased a 25% interest in the Loan from BOES. Agreement § 1, ECF 9-2.[7]  At the time of execution of the Agreement, the Loan had an outstanding balance of $2,977,877.21.  *Id.* at 2, ECF 9-2 at 3.  And, it was not then in material default.  *Id.* § 14(d).  MFB paid BOES $744,569.30, which was 25% of the then existing Loan balance, for its purchase of a 25% "Participation Interest" in the Loan.  *Id.* at 2, ECF 9-2 at 3. The Participation Interest (*i.e.* the interest sold by BOES and purchased by MFB under the Agreement) is defined in Section 1 of the Agreement, ECF 9-2, in part as follows:

---

[4]  The Property's address is listed on the Agreement as 5650 Clearview Key in Cambridge.  Agreement at 2, ECF 9-2 at 3.  MFB has used the address of 5650 Country Club Road.  ECF 11-1 at 1.  And, the Forbearance Agreement lists the Property's address as 5650 Horns Point Road.  Forbearance Agreement at 1, ECF 9-3 at 2.  This discrepancy is not material to the issues.

[5]  The page numbers on the Agreement do not correspond to the ECF page numbers.

[6]  Several individuals were guarantors of the Loan.  Agreement at 2, ECF 9-2; Forbearance Agreement at 1, ECF 9-3.  There were also "Entity Guarantors."  ECF 9-3 at 2.  The guarantors are not parties to this action.

[7]  Section 20 of the Agreement provides that the laws of the State of Maryland shall govern the "interpretation, validity and enforceability" of the Participation Agreement.

Subject to the terms and conditions of this Agreement, . . . MFB hereby agrees to purchase and acquire from OB,[8] title to an undivided interest and participation in the Loan as described below, and in any and all documents now or hereafter executed in connection with the Loan (collectively, the "Loan Documents") together with title to an undivided interest in any and all security interests or other liens which OB  has (or will have) in or to any personal or real property collateral to secure the Loan (the "***Collateral***") and all direct and indirect proceeds of such Collateral (collectively, the "***Participation Interest***").

In 2011, BOES extended additional credit to BSJ, which was also secured by a lien on the Property.  *See* Affidavit of Andrew J. Hines, former Executive Vice-President and Chief Credit Officer of MFB ("Hines Affidavit"), ECF 11-3 ¶ 4.  In his capacity as Chief Credit Officer, Mr. Hines "was responsible for overseeing" the Loan in question.  *Id.* ¶ 3.  According to Hines, "In 2011, pursuant to the Agreement and the existing Deed of Trust, BOES requested permission from MFB to place a second lien" on the Property, which was a subordinate lien.  *Id*. ¶ 4.  He avers that MFB sought "confirmation from BOES that any foreclosure of the property owned by BSJ would result in MFB getting paid its participation interest first from proceeds of any foreclosure sale." *Id.* ¶ 5.

In response, Mr. Hines received an email of October 26, 2011, from Joe Markley, a representative of BOES.  *Id.* ¶ 6; Markley email of October 26, 2011 ("Markley Email"), ECF 11-3 at 3.[9]  Attached to the Markley Email was an undated letter from Harold Robbins, then

---

[8] "OB" is defined in the Agreement as "Originating Bank," which is identified on the first page of the Agreement as BOES.  Agreement at 1, ECF 9-2 at 2.  As noted, BOES is Commerce's predecessor in interest in connection with the Agreement.  *See* Bill of Sale of October 5, 2012, at C-1, ECF 9-5.

[9] It is unclear from the Markley Email what Markley's position with BOES was at the time, but it appears from his signature block that he worked in the Commercial Loan Department.  ECF 11-3 at 3.

President of BOES.  ECF 11-3 at 4 ("Robbins Letter").  In the Robbins Letter, Mr. Robbins

referenced "Loan Number – 125795161"[10] and stated, in part, *id.*:

> This letter is to affirm the Bank of Eastern Shore has agreed to remit all proceeds on a FIRST OUT BASIS to MFB if the above loan (collateral) is obtained as a consequence of a foreclosure proceeding by BOES.  This condition is contained in the Participation Agreement, dated August 17, 2008, Section 9(b), Default by the Borrower.

Mr. Hines alleges that the Markley Email and the Robbins Letter "confirm[ed]," in the

event of foreclosure, BOES's "obligation to pay MFB its interest in the BSJ loan on a first out

basis pursuant to the terms of the Agreement."  Hines Affidavit ¶ 6, ECF 11-3.  Mr. Hines also

contends: "MFB would not have approved the extension of additional credit to BSJ and the

additional lien on the BSJ property without that confirmation from BOES."  *Id.* ¶ 5, ECF 11-3.

## B.  *Borrower Default and Foreclosure Sale*

At some point prior to May 2011, the Loan went into default.  Forbearance Agreement

§§ H, I, ECF 9-3; ECF 9-1 at 4.  Although BSJ made various efforts to cure the default, such as

entering into the Forbearance Agreement of May 4, 2011, ECF 9-3, the Loan remained in

default.  ECF 9-1 at 4.

In the meantime, the Maryland Commissioner of Financial Regulation closed BOES on

April 27, 2012, *id.* at 4, and the Federal Deposit Insurance Corporation ("FDIC") was appointed

as Receiver.  Insured Deposit Purchase and Assumption Agreement of April 27, 2012 ("Deposit

Agreement"), ECF 9-4 at 6.  Pursuant to its authority as Receiver of BOES, on October 5, 2012,

FDIC sold and assigned "all right, title and interest" in the Loan to Commerce.  *See* Bill of Sale

---

[10] Commerce contends that Loan Number 125795161 is a loan separate and distinct from the Loan at issue here.  ECF 9-1 at 23; *see* Assignment and Assumption of Interests and Obligations dated April 30, 2012 at D-8, ECF 9-6 at 9.  As discussed, *infra*, because I find the contract is unambiguous, I may not consider the Robbins Letter.  Thus, I need not resolve the alleged discrepancy created by reference in the Robbins Letter to the "Loan Number."

of October 5, 2012 ("Bill of Sale"), ECF 9-5 at C-1; Assignment and Assumption of Interests and Obligations ("Assignment"), ECF 9-6.  The Assignment is recorded among the land records of Dorchester County, Maryland, at Liber 1145, folio 176.  ECF 11-1 at 4.

On August 15, 2013, Commerce initiated a foreclosure proceeding against BSJ in the Circuit Court for Dorchester County.  *See Jeffrey H. Scherr v. BSJ Partners, LLC*, Case 09-C-13-20766, Circuit Court for Dorchester County; Affidavit of Alex O' Brien, president of Commerce Bank.  ¶¶ 1, 13 ("O'Brien Affidavit"), ECF 9-9. [11]  The foreclosure sale took place on December 6, 2013, *id.* ¶ 14, and was ratified on February 7, 2014.  *See* Order Ratifying Sale of February 7, 2014, ECF 9-7.  Although the foreclosure sale generated $1,393,469.86 in proceeds, O'Brien Affidavit ¶ 19, ECF 9-9; *see also* HUD-1, ECF 9-8, this sum was "insufficient to satisfy the then outstanding loan balance."  ECF 9-1 at 5.  After deducting $1,393,469.86 in foreclosure proceeds from the outstanding principal of $2,302,765.12, there was a loss on the Loan of $909,295.26.  ECF 11-1 at 11.

Commerce, as the successor in interest to BOES in regard to the Loan, is obligated to disburse the proceeds from the foreclosure sale in accordance with the Participation Agreement.  But, the parties disagree as to the way in which the disbursement is to occur.  Commerce argues that, under the Agreement, MFB is entitled to 25% of the foreclosure proceeds, *i.e.*, "the amount

---

[11] On August 12, 2013, Commerce also initiated suit in this Court against the individual guarantors of the Loan: *Bank of Commerce v. BSJ Partners, LLC et al*., Case No. ELH-13-cv-02349 ("Guarantor Action").  The parties settled the Guarantor Action on March 28, 2014.  *See* Stipulation of Dismissal dated March 28, 2014, Case No. ELH-13-cv-02349, ECF 38; O'Brien Affidavit ¶ 28, ECF 9-9.  Pursuant to that settlement agreement, Commerce was to receive a "present payment" of $525,000 from one group of guarantors and an additional $25,000 from another group of guarantors, to be paid "over time."  O'Brien Affidavit ¶ 29, ECF 9-9.  Commerce has paid MFB 25% of all amounts received pursuant to the Guarantor Action settlement and alleges that it will continue to pay MFB 25% of receipts of all additional settlement payments.  *Id.* ¶ 30.

of its ratable Participant's Share under the Agreement." ECF 9-1 at 5.  That equals the sum of

$348,367.46 of the foreclosure proceeds.  However, MFB contends, pursuant to the Agreement,

that it is entitled to 25% of the outstanding balance on the Loan principal, which equals

$575,691.28.  *Id.* at 5-6.

On March 20, 2014, Commerce and MFB entered into a Disbursement Agreement.

Under the Disbursement Agreement, Commerce paid MFB, from the foreclosure proceeds, the

undisputed amount of $348,367.46 and retained $817,778.58.  O'Brien Affidavit ¶ 25, ECF 9-9.

According to MFB, Commerce owes MFB an additional $227,323.82 ("Disputed Amount"),

which is the difference between what MFB contends is owed to it under the Agreement and what

Commerce paid to MFB.  The Disputed Amount of $227,323.82 is being held in escrow pending

this Court's resolution of the parties' dispute.  *Id.*

Resolution of the dispute turns on the provisions of the Agreement as well as principles

of contract construction.  Therefore, I review next the relevant provisions of the Agreement.

### C. *Terms of the Participation Agreement*

Section 1 of the Agreement describes and defines the interest sold by BOES and

purchased by MFB.  It states, in part, as follows, ECF 9-2 at 2 (emphasis in Agreement):

> **1.** **Purchase and Conveyance of Participation Interest**. Subject to the
> terms and conditions of this Agreement, OB hereby sells, grants, transfers,
> assigns, and conveys to MFB, and MFB hereby agrees to purchase and acquire
> from OB, title to an undivided interest and participation in the Loan as described
> below, and in any and all documents now or hereafter executed in connection with
> the Loan (collectively, the "Loan Documents") together with title to an undivided
> interest in any and all security interests or other liens which OB has (or will have)
> in or to any personal or real property collateral to secure the Loan (the
> "*Collateral*") and all direct and indirect proceeds of such Collateral (collectively,
> the "*Participation Interest*"). . . .

Section 3, ECF 9-2 at 4, defines the purpose of the Loan and the priority of the

participation interests relative to each other:

**3.     Purpose of Loan; Bank of Participation**.   The proceeds of the Loan have been and from time to time may be disbursed by the Originating Bank, to each of the Borrower(s) for the purpose(s) set forth in Section 1 above.   The Participation Interest and those interests of all other participants in the Loan shall, unless and except as otherwise expressly provided to the contrary herein, be of equal rank and priority in lien, and neither MFB nor any other participant in the Loan shall have priority over any other participant in the Loan unless so stated under Special Instructions above.

The Agreement contains a chart on pages 2 and 3, ECF 9-2 at 3-4, preceding Sections 2 and 3.  One portion is titled "Special Instructions:"  *Id.* at 3, ECF 9-2 at 4.  However, no Special Instructions are set forth.  *Id.*

Section 7 indicates how payments made by the Borrower are to be allocated under the Participation Agreement.  It provides:

**7.     Payments**.  OB [*i.e.*, Originating Bank] shall report to MFB, MFB's share of all accrued interest, fees, payments other than principal amounts and all principal sums collected and paid to OB by the Borrower(s), and, irrespective as to whether a default has occurred with respect to the Loan, promptly remit to MFB its share based on the priorities indicated below.  **[Check only one box.]**

a.     [  ]  **First Out:**   First, to MFB, until each time as MFB has received an amount equal to its Participation Amount, then to OB until such time as OB has received an amount equal to its Retained Amount and then ratably between OB and MFB in an amount equal to their respective allocable shares (based on MFB's Participant's Share) of interest, fees and any payments other than principal amounts.

b.     [  ]  **Last Out:**   First, ratably between OB and MFB in an amount equal to their respective allocable shares (based on MFB's Participant's Share) of interest, fees and any payments other than principal amounts, then to OB until such time as OB has received an amount equal to its Retained Amount, and then to MFB in an amount equal to its Participation Amount.

c.     [X]  **Pro Rata:**   Ratably between MFB and OB (with appropriate allocation of fees, interest and any other payments, based on MFB's Participant's Share).

d.     [  ]  **100%:**   All payments to MFB up to an amount equal to the Participation Amount plus interest, fees and any other payments allocable to MFB.

8

Section 8 governs the allocation of losses.  It states, in part:

**8.**     **Losses and Expenses**.

(a)     Except as may be otherwise provided in Section 7 hereof, (i) MFB and all other participants in the Loan shall share pro-rata, as hereinabove specified, of all net proceeds received by OB as a consequence of such participation interests in the Loan, any losses sustained in connection with the Loan . . . .

Section 9 is titled "**Default by Borrower**."  Section 9(b) provides as follows:

(b)     If foreclosure upon the Collateral is the action taken, OB shall promptly remit to MFB its percentage interest first, as hereinabove specified, of all net proceeds received by OB as a consequence of such foreclosure proceeding, including, without limitation, net proceeds of foreclosure sale, net income from operation of the Collateral pending liquidation, and net proceeds of any resale of the Collateral.  If OB acquires an interest in the Collateral through foreclosure, deed in lieu of foreclosure or otherwise, OB and MFB shall have undivided beneficial interests in the Collateral equal to their respective percentage interests in the Loan and title will be taken in the name of OB or its nominees.  All expenses incurred in connection with any action taken pursuant to the provisions of this Section 9 shall be shared by OB and MFB in accordance with their respective percentage interests in the Loan.

Section 15 is titled "**Administration of Loan**."  Section 15(d) provides:

(d)     Pursuant to Section 7 above, all Collections received by OB in connection with the Loan, shall be applied, as between OB and MFB, first, to reasonable out of pocket expenses incurred (and approved by MFB) in collecting the Loan, second, ratably between OB and MFB to interest earned on the Loan, and third ratably to the unpaid principal balances of MFB's Participation Interest, and the Retained Amount of the Loan.

## II.     STANDARD OF REVIEW

As indicated, the parties filed cross-motions for summary judgment.  Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  As the Fourth Circuit recently observed, Fed.

R. Civ. P. 56 "is a mechanism to obviate trial . . . ." *Boyer-Liberto v. Fontainbleau Corp.*, 752 F.3d 350, 355 (2014), *rehearing en banc granted* July 1, 2014; *reargued* September 18, 2014.

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine dispute as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  In resolving a motion for summary judgment, a district court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Moreover, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Generally, in the face of conflicting evidence, such as competing affidavits,

summary judgment is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See*, *e.g.*, *Boone v. Stallings*, 583 Fed. App'x. 174 (4th Cir. 2014) (per curiam). In other words, the court may not make credibility determinations on summary judgment. *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

As noted, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of *material* fact. *See Anderson*, *supra*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248. On the other hand, a court must award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. Therefore, "the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* And, the court should "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (citation and internal quotation marks omitted).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied,* 540 U.S. 822 (2003). "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render

judgment." 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 336–37 (3d ed. 1998, 2012 Supp.).

### III.    DISCUSSION

#### A. *Declaratory Judgment; Principles of Contract Interpretation*

In the federal courts, declaratory judgments are authorized by the federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), which provides (with exceptions not relevant here) that, in "a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." Here, the parties' rights and obligations arise under the Participation Agreement.

The Participation Agreement expressly states that it is governed by Maryland law. Agreement § 20, ECF 9-2. Under Maryland law, "the parties to a contract may agree as to the law which will govern their transaction." *Bank of Am., N.A. v. Jill P. Mitchell Living Trust,* 822 F. Supp. 2d 505, 517 (D. Md. 2011) (internal quotation marks omitted).

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intentions, courts look first to the written language of the contract. As the Maryland Court of Appeals recently said: "Courts in Maryland apply the law of objective contract interpretation, which provides that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties. . . ." *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted); *see also Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 709 (2007).

The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement. . . . " *Dumbarton Imp. Ass'n, Inc.*, 434 Md. at 52, 73 A.3d at 232.  Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *General Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)); *see Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship,* 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

Under Maryland law, the interpretation of a contract is a question of law.  *See Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014) (citing *Towson Univ. v. Conte,* 384 Md. 68, 78, 862 A.2d 941, 946 (2004)); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003).  This includes the determination of whether a contract is ambiguous.  *Sy–Lene of Wash., Inc. v. Starwood Urban Retail II, LLC,* 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

As indicated, to determine the parties' intentions, courts first look to the written language of the contract.  *See Walton,* 391 Md. at 660, 894 A.2d at 594.  "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly,* 376 Md. 302, 313, 829 A.2d 626, 632–33 (2003) (citations omitted).  A court will presume that the parties meant what they stated in an

unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean.  *See Dumbarton,* 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.,* 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East,* 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g., Scarlett Harbor,* 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used."  *Brensdel v. Winchester Constr. Co.,* 392 Md. 601, 623, 898 A.2d 472, 485 (2006).  Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods,* 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (*quoting Canaras v. Lift Truck Servs.,* 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.,* 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

In addition, "the principles of contract interpretation require that 'in ascertaining the true meaning of a contract . . . the contract must be construed in its entirety. . . .'" *Dumbarton*, 434 Md. at 52, 73 A.3d at 232-33 (2013) (citation omitted) (alteration in *Dumbarton*).  Indeed, "'if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.'"  *Id.*; 73 A.3d at 232-33 (quoting *Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 167, 198 A.2d 277, 283 (1964)).

14

Moreover, "'[w]here two clauses or parts of a written agreement are apparently in conflict, and one is general in character and the other is specific, the specific stipulation will take precedence over the general, and control it.'" *Heist v. E. Sav. Bank, FSB*, 165 Md. App. 144, 151, 884 A.2d 1224, 1228 (2005) (quoting *Fed. Ins. Co. v. Allstate Ins. Co.,* 275 Md. 460, 472, 341 A.2d 399, 407 (1975) (citations omitted)); *see Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship*, 918 F. Supp. 2d 428, 446 (D. Md. 2013) (citing *Heist*, 165 Md. App. at 151, 884 A.2d at 1228), *aff'd*, ____ Fed. App'x. ____, 2014 WL 7172475 (4th Cir. Dec. 17, 2014).

Based on these well established principles of contract interpretation, "[if] the language employed in a contract is unambiguous, a court shall give effect to its plain meaning." *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted).   No further construction or consideration of extrinsic evidence is necessary.  *Id.* (citations omitted); *see Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006).  Indeed, "[e]xtrinsic evidence is only utilized when the intent of the parties and the purpose of [the contract] cannot be divined from the actual language of the [contract] in question, necessitating a reasonable interpretation of the language in light of the circumstances surrounding its adoption."  *City of Bowie v. Mie Properties, Inc.*, 398 Md. 657, 681, 922 A.2d 509, 523 (2007) (citation omitted) (alteration supplied); *see Clendenin*, 390 Md. at 459, 889 A.2d at 393.  In other words, extrinsic evidence may only be considered if a contract is ambiguous.  *See Calomiris*, 353 Md. at 437, 727 A.2d at 363 ("We have frequently barred the admission of extrinsic evidence when the written contractual language is unambiguous."); *Huggins*, 220 Md. App. at 421-22, 103 A.3d at 1142-43 (affirming circuit court's failure to consider extrinsic evidence of prior and contemporaneous agreements because agreement at issue was not ambiguous).

Notably, ambiguity does not exist "simply because, in litigation, the parties offer different meanings to the language." *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 751, 929 A.2d 932, 952 (2007). Rather, "[u]nder the objective view [of contract interpretation], a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible [to] more than one meaning." *Calomiris*, 353 Md. at 436, 727 A.2d at 363 (citation omitted); *see Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 87, 5 A.3d 683, 690-91 (2010) (citation omitted); *Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy–Lene of Washington,* 376 Md. at 167, 829 A.2d at 547 (citations omitted); *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999).

If the contract is ambiguous, "'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'" *Cnty. Commissioners of Charles Cnty. v. St. Charles Associates Ltd. P'ship,* 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (quoting *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 596-97, 578 A.2d 1202, 1208 (1990)); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.,* 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010). "[I]f ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract.'" *Clendenin*, 390 Md. at 459-60, 889 A.2d at 394 (quoting *Collier v. MD–Individual Practice Association, Inc.,* 327 Md. 1, 6, 607 A.2d 537, 539 (1992)) (further citations omitted). In the context of summary judgment, if "extrinsic evidence . . . leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact.'" *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC,* 875 F. Supp. 2d 511, 526 (D. Md.

2012) (*quoting Washington Metro. Area Transit. Auth. v. Potomac Inv. Props., Inc.,* 476 F.3d 231, 234 (4th Cir. 2007)).

With this framework in mind, I turn to review the Participation Agreement and the contentions of the parties.

## B. *The Contentions*

The parties disagree about the proper allocation of proceeds obtained from the foreclosure of the Property. Commerce argues that "the Agreement plainly and unambiguously" provides that "the parties will share all proceeds and losses from the loan on a pro rata basis subject to each party's participation interest." ECF 9-1 at 3. MFB counters that, under the Agreement, "it is entitled to $575,691.28 from the proceeds of [the foreclosure] sale, which represents its percentage interest (25%) of the outstanding principal loan balance." ECF 11-1 at 2.

For convenience, I quote again from Section 9(b) of the Agreement, which governs disbursements from a foreclosure sale of the Property. It states, in pertinent part: "OB shall promptly remit to MFB its *percentage interest* first, as hereinabove specified, of all net proceeds received by OB as a consequence of such foreclosure proceeding. . . ." (Emphasis added.) Percentage interest is not defined in the Agreement, and its meaning is a core issue. But, Section 1 does say that "MFB's interest in the Loan, expressed as a percentage, is 25.00%. . . ."

In Commerce's view, the meaning of Section 9(b) is plain. Commerce states, ECF 9-1 at 17-18:

> Although "percentage interest" is an undefined term, there is no mystery as to what the term means. Section 1 of the Agreement, as set forth previously, provides, "MFB's interest in the Loan, expressed as a percentage, is 25%." Accordingly, where Section 9(b) provides that "OB shall promptly remit to MFB its percentage interest first . . . of all net proceeds received by OB as a consequence of such foreclosure proceedings," the Agreement is directing

17

Commerce to pay MFB 25% of the foreclosure proceeds, which Commerce has already done.

Conversely, MFB interprets Section 9(b) to mean that, from the foreclosure sale proceeds, MFB is entitled to recover its full portion of the outstanding Loan principal, before any other disbursements. ECF 11-1 at 8. In other words, MFB contends that, under the terms of the Participation Agreement, in the event of a foreclosure sale, it is entitled to recover what it purchased—"its full 25% interest in the Loan first, before the remaining foreclosure proceeds are distributed to Commerce." *Id.* That sum, argues MFB, amounts to $575,691.28.

According to MFB, Commerce's interpretation requires the impermissible insertion of the word pro-rata into the text of Section 9(b). ECF 11-1 at 14-15. MFB argues: "Unlike other provisions of the Agreement, Paragraph 9(b)[12] of the Agreement does not include the term 'pro-rata.'" *Id.* at 14. MFB adds: "Had the parties intended a pro-rata distribution of the proceeds of the foreclosure sale, they certainly knew how to include language mandating such an allocation based upon the provisions of the Agreement that use the term pro-rata." *Id.* at 14-15.

In support of MFB's position, MFB observes that the Participation Agreement provides for different distributions depending on the source of the funds. ECF 11-1 at 3. MFB posits that, on the one hand, Section 7 identifies how payments made by the borrower should be allocated. Such funds are to be disbursed "[r]atably between MFB and OB . . . ." Agreement § 7, ECF 9-2. On the other hand, § 9(b) "deals with the *separate* issue of a default by the Borrower, and governs how the proceeds of a foreclosure sale of the Property would be allocated between [Commerce] and MFB." ECF 11-1 at 3 (emphasis supplied by MFB). MFB explains, *id.* at 8:

---

[12] MFB refers to the various provisions of the Agreement as Paragraphs. Commerce refers to them as Sections. Unless I am quoting, I will use the term Section, because that is the terminology used in the Agreement.

Paragraph 9(b) and the term 'first" [sic] must be given a meaning separate and distinct from other provisions of the Agreement.  In order to do so, Paragraph 9(b) must be interpreted so that MFB receives its full 25% interest in the Loan first, before the remaining foreclosure proceeds are distributed to Commerce.

In MFB's view, its interpretation "gives effect to both Paragraph 7 and Paragraph 9 of the Agreement." *Id.* at 10.  According to MFB, its construction of the Agreement "recognizes that payments received from the Borrower were to be allocated on a pro-rata basis, while proceeds received as a result of a foreclosure sale were to be paid first to MFB, and the remainder to Commerce." *Id.*

Moreover, MFB maintains that Section 8 of the Agreement supports its position that it is entitled to its full 25% interest in the outstanding Loan principal, payable from the foreclosure sale proceeds, without any obligation to share in the $909,295.26 loss on the Loan, (*i.e.*, the outstanding principal of $2,302,765.12 minus the $1,393,469.86 foreclosure proceeds results in a loss of $909,295.26).  *See* ECF 11-1 at 11.  MFB offers this circular explanation: "[I]f MFB is repaid its interest in the Loan from proceeds of the foreclosure sale, then it is not entitled to share in the losses.  It is only when MFB's interest in the Loan is not paid back in full that some loss would be allocated to MFB under Paragraph 8 of the Agreement." ECF 11-1 at 12.  In this way, MFB's construction carves out a foreclosure sale under Section 9(b) as an exception to the ratable distribution of losses required by Section 8(a).

MFB also insists that, in negotiating the Agreement, it bargained for greater protection from loss within the limited context of a foreclosure.  ECF 11-1 at 12-13.  According to MFB, by including the word "first," "Section 9(b) shifted a greater risk to Commerce associated with a default and subsequent foreclosure sale." *Id.* at 12.  MFB alleges:  "It was willing to purchase the 25% interest in the Loan from BOES only if this protection was in place." *Id.* at 12.  MFB explains, *id.*  at 12-13:

This allocation of risk to Commerce in Paragraph 9(b) stands in stark contrast to payments received from the Borrower [provided for under Section 7]. In the event the Loan was re-paid by the Borrower, there was no need for MFB to protect itself and therefore was willing to accept, on a pro-rata basis, the payments made by the Borrower. There is nothing commercially unreasonable about MFB seeking to ensure greater protection in the event of a foreclosure of the collateral. It obtained such protection by including the term "first" in Section 9(b) of the Agreement.

Commerce advances several arguments challenging MFB's position. According to Commerce, (1) MFB's interpretation "improperly substitutes" the phrase "percentage interest" in Section 9(b) for the phrase "participation interest", ECF 9-1 at 18; (2) MFB's interpretation cannot be reconciled with how the Participation Agreement allocates losses on the Loan, *id.* at 15; and (3) MFB's interpretation is "commercially absurd," because it would transform the character of the Agreement from a participation agreement to a loan. *Id.* at 19. I will discuss these contentions in turn.

Commerce maintains that MFB's construction of the Agreement improperly replaces the term "percentage interest" with the term "participation interest." *Id.* at 18. Commerce asserts: "MFB, despite periodically correctly referring to the language of the Agreement setting forth its entitlement to its '***percentage interest***,' instead demands that it be paid something entirely different: It demands it be paid its '***participation interest***' which is nowhere provided for in the Agreement." *Id.*[13]

In my view, MFB reads Section 9(b) in a vacuum. Its position cannot be reconciled with the allocation of losses as provided under Section 8 of the Agreement, other terms in the

---

[13] Commerce also argues that MFB's interpretation requires the substitution of the phrase "percentage interest" in Section 1 with a different defined term, "Participation Amount." *See*, *e.g.*, ECF 9-1 at 17-18. The "Participation Amount" is described in Section 1 of the Agreement as the "purchase price for the Participation Interest." But, MFB does not argue that it is entitled to the full amount it paid to acquire its interest in the Loan. Rather, MFB contends it is entitled to the balance due to MFB on the Loan.

Agreement, and the construction of the Agreement as a whole.  In addition, MFB's construction

is at odds with the basic concept of a participation agreement.

Participation Interest is a defined term in the Agreement.  *See* § 1, ECF 9-2 at 2.  As

noted, Participation Interest is expressed, in part, as follows, Agreement § 1:[14]

> [T]itle to an undivided interest and participation in the Loan as described below,
> and in any and all documents now or hereafter executed in connection with the
> Loan (collectively, the "Loan Documents") together with title to an undivided
> interest in any and all security interests or other liens which OB has (or will have)
> in or to any personal or real property collateral to secure the Loan (the
> "***Collateral***") and all direct and indirect proceeds of such Collateral (collectively,
> the "***Participation Interest***").

Commerce observes: "Of particular import in Section 7 is not only the option selected for

the priority of payments, that being 'ratably' on a 'Pro Rata' basis, but also the options listed

**BUT NOT SELECTED**. . . ." ECF 9-1 at 15 (emphasis supplied by Commerce).   Significantly,

in Section 7, "First Out" and "100%" are listed as potential options for disbursement of payments

by the Borrower, but neither was selected.  Commerce asserts: "Had either of those options been

selected, that action might have support[ed] the interpretation advanced by MFB that it is entitled

to repayment of its investment," on a "LIFO" basis (i.e., Last in, first out).  *Id.* at 3, *id.* at 15.

Section 8(a) of the Agreement requires the ratable allocation of any losses on the Loan.

As noted, it provides, in pertinent part:  "Except as may be otherwise provided in Section 7

hereof, (i) MFB and all other participants in the Loan shall share pro-rata in accordance with

MFB's Participation Interest . . . any losses sustained in connection with the Loan. . . ." ECF 9-

2.  According each word in Section 8(a) its plain meaning, "any losses" are to be distributed

ratably unless an exemption to the ratable distribution of losses is listed in Section 7.  Notably,

no exceptions were listed in the Agreement.  *Id.*

---

[14] *See also* page 7, *supra*, for a more complete definition of Section 1.

MFB insists that Commerce's interpretation does not give effect to the word "first" used in Section in 9(b).  ECF 11-1 at 13.  The word "first" has a common meaning:  coming before others in time.  ECF 9-1 at 22; *see* RANDOM HOUSE COLLEGE DICTIONARY at 1053 (rev. ed. 1980) (defining "first", *inter alia,* as "being before all others with respect to time….").

Commerce disagrees, stating, ECF 9-1 at 22:

> As previously set forth, despite the use of the word "first," Section 9(b) does not anywhere refer to MFB being remitted its entire investment, but instead refers to receiving its "percentage interest" in the foreclosure proceeds (i.e. its 25% ratable interest).  Moreover, relying on the word "first" MFB is attempting to convert its ratable interest in the Loan, as set forth in Sections 1, 2, 3, 7, 8, 9 and 15, into a LIFO (last in first out) interest in the Loan, which is nowhere provided for, and which is expressly rejected in Sections 1 and 7 of the Agreement.  According every word [in Section 9] its [plain] meaning, as required by the rules of contract construction, the use of the word "first" obligates Commerce to pay MFB its percentage interest (25%) of the foreclosure proceeds first (or before) it distributes its 75% share to itself.  In compliance with this provision, Commerce has already paid MFB its 25% interest in the amount of $348,356.46.  MFB is entitled to nothing further.

As I see it, Commerce's construction relies on the plain meaning of the words in Section 9(b) and is easily reconciled with the other provisions of the Agreement.  Although MFB maintains that Commerce attempts to insert the word pro rata into Section 9(b), ECF 11-1 at 14-15, the absence of the terms pro rata or ratable from Section 9(b) is not dispositive.

Construing § 9(b) in the context of the Participation Agreement as a whole, a foreclosure sale of the collateral does not excuse MFB from having to bear its ratable share of the losses on the Loan.  "Contractual terms cannot be read out of the agreement altogether, and the meaning of a provision is not discerned by reading it in isolation, but by recognizing its relation to the other terms of complete contractual relationship."  *Atlantic Contracting & Material Co. Inc. v. Ulico Cas. Co.*, 380 Md. 285, 310, 844 A.2d 460, 474 (2004).

The suggestion that "percentage interest" in Section 9(b) means a 25% ratable share of the foreclosure sale proceeds is supported by the use of the phrase "percentage interest" in the same paragraph.  As already noted, Section 9(b) states: "If OB acquires an interest in the Collateral through foreclosure, deed in lieu of foreclosure or otherwise, OB and MFB shall have undivided beneficial interests in the Collateral equal to their *percentage interests in the Loan*," which is 25% for MFB.  Agreement § 9(b), ECF 9-2 (emphasis supplied).  In other words, if Commerce acquires an interest in the collateral, MFB would be entitled to a ratable interest in the Collateral as well, in accordance with its percentage interest in the Loan.  Significantly, this interpretation does not require the addition or deletion of any terms, defined or otherwise.

In addition, as Commerce puts it, if "MFB is entitled to repayment in the event of a default by the Borrower, irrespective of the amount of recovery and regardless of the amount of the loss on the Loan," this would "convert[ ] the participating investment itself into a loan", whereby payment is guaranteed.  ECF 9-1 at 20.  That is generally inconsistent with a participation agreement.

"In a typical loan participation, the lead lender transfers to the participant not only the benefits to be received from a share in the underlying loan (*i.e.*, a *pro rata* share in the principal and interest payments) but also the risk of the borrower's default." *In re Sackman Mortg. Corp.*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993).  In contrast, "'a participation [interest] is a contractual arrangement between a lender and a third party whereby the third party, labeled a participant, provides funds to the lender . . . .'" *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 736 (6th Cir. 2001) (quoting *Natwest USA Credit Corp. v. Alco Standard Corp.,* 858 F.Supp. 401, 407-08 (S.D.N.Y. 1994)).

Indeed, form aside, the "most determinative factor" as to whether a transaction involves a

participation interest or a loan is the "risk allocation." *In re Corporate Fin., Inc*., 221 B.R. 671, 679 (Bankr. E.D.N.Y. 1998); *see McVay v. W. Plains Serv. Corp.,* 823 F.2d 1395, 1398 (10th Cir. 1987) (stating that factors suggesting a loan instead of a participation agreement "include anything that indicates the participants are not subject to the normal risks of ownership, such as guaranteed returns by the lead institution. . . ."). If the borrower defaults, "the participant is entitled to a *pro rata* share of any monies received upon liquidation of the collateral, but it has no right of recourse against the lead lender." *In re Sackman*, 158 B.R. at 932.

When "the participant does not bear the same risk of loss as the seller, or if the seller has made a guarantee of payment to the participant, the transaction is generally considered to be a loan and not a sale of a [participant] interest. . . . [A] loan transaction often includes a guarantee of repayment to the investor." *Corporate Fin.*, 221 B.R. at 679 (citations omitted). On the other hand, "[i]n a typical participation transaction, the participant shares the same risk as the lead lender regarding the receipt of payment, as both rely on the creditworthiness of the underlying borrower. " *Id.* (citation omitted).

MFB relies on *FirsTier Bank, Kimball, Neb. v. F.D.I.C.*, 935 F. Supp. 2d 1109 (D. Colo. 2013), ECF 11-1 at 9-10, to argue that the Agreement protected MFB from the risk of loss in the event of a foreclosure sale. In MFB's view, *FirsTier* "demonstrates that payments received from a borrower and proceeds received as a result of the forced sale of collateral can, and often are, treated differently in participation agreements." ECF 11-1 at 10. But, significantly, MFB overlooks that the *FirsTier* Court ultimately concluded that a typical participation arrangement does not insulate the participant from losses on the loan. *FirsTier*, 935 F. Supp. 2d at 1125.

*FirsTier* concerned the interpretation of a participation agreement that "distinguishe[d] between 'payments' received from the borrower and 'collected funds' that are received in the

event of default." *Id*.  In that case, a loan participant, Adams Bank & Trust ("Adams"), claimed it was entitled to a "last-in, first-out" priority payment of its interest in the loan.  *Id.* at 1112; *see also id*. at 1124.   In contrast, the lead bank insisted the agreement provided for a pro-rata distribution of foreclosure sale proceeds.  *Id.* at 1112.  With respect to payments, the agreement at issue stated, *inter alia:*  "'Originating Institution will promptly pay to the Participant . . . an amount equal to the Participant's Participation interest. . . . Such application of funds shall be on a [last-in, first-out] basis with Participant's Participation Interest being distributed first before the application of funds to the Originating Institution.'"  *Id.*  at 1113 (alteration supplied).   The agreement also provided: "'The sale is made by the Originating Institution without recourse and shall in no way be construed as an extension of credit by the Participant to the Originating Institution.'"  *Id.*

Viewing the participation agreement in its entirety, the district court rejected the participant's construction as "legally implausible…."  *Id*. at 1125.  Of import here, the court said that if the participant was absolutely insulated from any losses on the loan, as it suggested, then the parties "would have structured a lending relationship rather than a participation.[ ]"  *Id.* According to the court, Adams's construction of the LIFO priority rendered "meaningless" several other provisions of the participation agreement.  *Id*. at 1120.  The same rationale applies here.

Nothing in the Agreement here provides a guaranteed return to MFB on its investment. The plain language of Section 9(b), read in the context of the entire Agreement, readily supports Commerce's interpretation that risk is distributed in a manner proportional to each party's respective Participation Interest and in accordance with a typical participation agreement. MFB's interpretation of Section 9(b) is at odds with the nature of a participation agreement, the

structure of this transaction as the sale of an interest in the Loan, and other provisions of the Agreement.

For example, the Agreement expressly states in its third recital: "[T]he parties intend hereby to convey title to the participation interest to be purchased by MFB and nothing herein shall be construed as creating a relationship of debtor and creditor . . . ." Agreement at 1, ECF 9-2. Section 2, which defines the "Relationship Created" by the Agreement, explicitly states: "[N]othing herein contained is intended, or shall be construed, as creating a loan by MFB to OB or any other relationship of debtor and creditor or any fiduciary relationship between OB and MFB." *Id.* § 2, ECF 9-2. Similarly, Section 3 states, in part: "The Participation Interest and those interests of all other participants in the Loan shall, unless and except as otherwise expressly provided to the contrary herein, be of equal rank and priority in lien, and neither MFB nor any other participant in the Loan shall have priority over any other participant in the Loan unless so stated under Special Instructions above." *Id.* § 3, ECF 9-2. As noted, no special instructions are listed. Likewise, Section 7 requires that sums collected and paid to BOES by the Borrower should be disbursed "[r]atably between MFB and OB." And, as indicated, Section 8 explicitly allocates "any losses" on a pro rata basis.

Alternatively, MFB argues that, if the Court is inclined to accept Commerce's interpretation of the Agreement, "Commerce nevertheless is not entitled to judgment as a matter of law because there is an issue of material fact as to whether the Agreement was modified as a result of the letter from Mr. Robbins, the then President of BOES." ECF 11-1 at 16. As indicated, the undated Robbins Letter was attached to the Markley Email of October 26, 2011, sent to Hines. The Robbins Letter stated, ECF 11-3 at 4:

> This letter is to affirm the Bank of Eastern Shore has agreed to remit all proceeds on a FIRST OUT BASIS to MFB if the above loan (collateral) is

obtained as a consequence of a foreclosure proceeding by BOES. This condition is contained in the Participation Agreement, dated August 17, 2008, Section 9(b), Default by the Borrower.

In MFB's view, the Agreement was modified through the Robbins Letter. ECF 11-1 at 16. MFB posits: "The October 26, 2011 letter from Mr. Robbins not only explained the parties' interpretation of the language of the Agreement, it also constituted an amendment to the Agreement such that MFB was to receive its interest in the Loan first in the event of a foreclosure." *Id.* MFB also asserts that "MFB was not required to consent to the additional lien on the Property and did so as a result of Mr. Robbins['s] letter confirming that MFB would be paid its percentage interest in the Loan first if the Property was sold as a result of the foreclosure sale." *Id.* (citing Hines Affidavit ¶ 6, ECF 11-3).

However, in my view, the plain language of the Agreement does not reveal an ambiguity. Therefore, I may not (and need not) consider this extrinsic evidence or the merits of this argument.

## CONCLUSION

I agree with Commerce that, if I were to adopt MFB's reasoning, "it would convert Commerce from the lead lender and co-investor in the Loan . . . to either a guarantor of MFB's investment in the Loan, or to a borrower from MFB . . . which the Agreement expressly disavows." ECF 9-1 at 3. MFB is entitled to recover 25% of the proceeds of the foreclosure. For the foregoing reasons, I will grant Commerce's Motion (ECF 9) and deny MFB's Motion (ECF 11).

A Declaration and an Order follow, consistent with this Memorandum Opinion.

Dated: <u>March 2, 2015</u>                                   <u>            /s/            </u>
                                                          Ellen Lipton Hollander
                                                          United States District Judge